## In re MERCANTILE ARCADE REALTY CORPORATION.

### No. 24249–C.

District Court, S. D. California, Central Division.

Aug. 11, 1937.

John J. Kuhn, of New York City, for Trustee Account Blumenthal settlement.

White & Clapp, of Philadelphia, Pa., for Stroud & Co., Inc., Chartered Investment Co., and Pennsylvania Co. for Insurance on Lives.

Earle M. Daniels, of Los Angeles, Cal., for C. J. Pearce, trustee.

Mitchell, Silberberg, Roth & Knupp, of Los Angeles, Cal., for Federal United Corporation and Chartered Investment Co.

Harry G. Sadicoff, of Los Angeles, Cal., for Fred E. Harris, bondholder.

Frank M. Willcox and George A. Judson, both of Los Angeles, Cal., for Frank D. Fuller, bondholder.

Julius V. Patrosso, of Los Angeles, Cal., for debtor corporation.

Gibson, Dunn & Crutcher, of Los Angeles, Cal., and Charles A. Riegelman (of Riegelman, Hess & Hirsch), Beekman, Bogue, Leake, Stephens & Black, and Louis

A. Mahoney, all of New York City, and Townsend, Elliott & Munson, of Philadelphia, Pa., for Bondholders' Protective Committee.

COSGRAVE, District Judge.

The Mercantile Arcade Realty Corporation owns a piece of rental business property in the downtown district of Los Angeles, appraised at $2,650,000, with outstanding first mortgage bonds to the amount of $3,639,200, held principally in New York by some 3,300 individual owners. Second mortgage bonds on the property amount to $942,000 and are held largely by the Chartered Investment Company of Philadelphia. Interest became delinquent on the first mortgage bonds on June 1, 1933, the corporation having previously defaulted on its second mortgage bonds. The entire corporate stock of the Mercantile Arcade Realty Corporation was owned by one Blumenthal, residing in New York. The first mortgage bonds had been marketed by three brokerage firms: Halsey, Stuart & Co., Inc.; S. W. Straus & Co.; and Stroud & Co.

Prior to the delinquency of the interest, these companies, through solicitude for the interests of their customers, the first mortgage bondholders, distrusting the management of the debtor corporation, and fearing for its solvency, interested themselves in the affairs of the company to the extent of securing from Blumenthal what is referred to as a "stand still" agreement, effective January 12, 1933. By this agreement the assets of the company were conserved, although Blumenthal was continued in the management. The agreement worked satisfactorily up to October 29, 1934, at which time, in order to prevent certain threatened detrimental action on the part of Blumenthal, a petition under section 77-B of the Bankruptcy Act (11 U.S.C.A. § 207) was filed by three creditors, proposing that it effect a reorganization, and the affairs of the corporation were thereupon placed in the hands of a temporary trustee. This ended the effective control of the affairs of the corporation by Blumenthal.

The activity of the brokerage houses above named resulted in the formation of a bondholders' committee in March of 1934, composed of four members, generally employees or officers of the brokerage houses mentioned. The activities of the committee were such that on March 1, 1935, a bondholders' protective agreement was formulated under which approximately one-half of the first mortgage bonds were deposited. Blumenthal consented to the filing of a petition for reorganization under section 77-B of the Bankruptcy Act on behalf of the debtor corporation itself, and later, as the result of certain litigation prosecuted against him in New York and for other considerations, surrendered all of the capital stock to the bondholders' committee. This was done on May 21, 1935, and all subsequent proceedings have been had under this petition of the corporation itself.

The plan of reorganization, dated as of March 1, 1936, was filed by the Chartered Investment Company and another creditor on June 16, 1936, the first named being the owner of a great majority of the second mortgage bonds. The plan agreed to by all parties interested has been adopted in its material parts and its details are unimportant here. No contest except with respect to unimportant details developed. Its final adoption was preceded by numerous hearings, formal in their nature, but necessary in order to insure compliance with the provisions of the Bankruptcy Act. The present proceeding is for the purpose of fixing fees for the various service rendered and reimbursement for the expenses incurred in the proceedings under division 9, subsection (c) of section 77-B (11 U.S.C.A. § 207 (c) (9).

The total amount asked for by all claimants is $204,662.13. Since the net income from the real property, being the entire property of the reorganized corporation, is $80,000 annually, it will require two and one-half years of income to equal the total of the claims if they are allowed as presented.

The bondholders' protective committee, consisting of four members, ask a total compenstion of $25,000. They set forth expenses paid, including an estimate of what will be required to wind up their affairs of $26,938.83 in addition. The committee received all told bonds totaling $1,709,000, or something less than half of those outstanding. Included in the $26,938.83 is one item allocated to administrative expenses amounting to $9,366.80, which might seem to be a fair estimate of the total cost of handling the details of the committee's affairs. Numerous additional expenses are listed, however, but since the operations of the committee were carried

on in New York, the court will assume that, with the exception of certain items of expense which are rejected, and some the amount of which are excessive, the remaining items were properly incurred.

A single item of $14.04 allocated to cable expense was questioned at the hearing. Upon inquiry it developed that the chairman of the bondholders' protective committee had sought surcease from the vexations of his duties on a yacht in the quiet waters of the Bermudas. Here he was advised on April 5, 1935, by counsel, not by ordinary mail, not by night letter (25 words for $3), nor yet by deferred cable (18 cents per word), but by "straight" cable at 36 cents per word, that due to certain obstructive tactics the intended procedure of the bondholders' committee had gone awry and that it would be necessary to take the chairman's deposition *on his return to New York six days thereafter.* To what extent this relieved the anxiety of the chairman, or why such a totally unnecessary message should be sent at all, does not appear. Manifestly, such an item is trifling so far as the amount of expense involved is concerned; it is, however, highly significant as indicating the heedlessness of expense throughout the proceedings where the bondholders pay the bills.

■ Attorneys' fees are sought for services rendered to the bondholders' protective committee by four firms of attorneys, two in New York, one in Philadelphia, and one in Los Angeles. The total amount asked for as fees is $75,000. The necessity for such multiplicity of counsel as advisor to the bondholders' protective committee is neither clear nor understandable. The corporation had only common stock, a first and second mortgage. The corporate stock was owned by one individual, the first mortgage bonds were widely held, but the second mortgage bonds were held by very few, not more than some half dozen. The financial structure of the corporation, therefore, was extremely simple. Extensive reorganization work was necessary, but hardly anything was presented in the way of a difficult legal problem, and none such existed. The hearing on the proposed plan, which at no time involved any serious issue, for the plan was not materially changed from the form in which it was first presented, was handled by the firm of Gibson, Dunn & Crutcher of Los Angeles, a firm certainly competent to attend to such matters. The necessary time,

care, and attention were given by that firm without stint; nevertheless, a representative of one of the New York firms attended the hearings, making at least two separate trips to Los Angeles for the purpose, during one of which he remained several weeks, all at an expense to the bondholders with respect to transportation of $1,963.86. In addition thereto, long distance telephone tolls between Los Angeles and New York run into hundreds of dollars. It is conceivable that in the stress and heat of a desperate court battle, or in important business matters where time is important, the long distance telephone is a necessity. Here, however, at no time during the hearings did there exist anything in the nature of an exigency justifying extraordinary expense of instant communication between Los Angeles and New York. Such highly extravagant methods, at the expense of creditors unable to speak for themselves, should not be countenanced. At the hearing, inquiry on the part of the court showed no necessity at any stage of the proceedings requiring the use of long distance telephone or any method of communication that could not have been safely accomplished by air mail or even by regular mail.

■ In addition to attorneys' fees, certain of the legal firms set forth extensive items, such as carfares, postage, and typewriting; while undoubtedly counsel should be allowed expenses that are not a necessary incident to their employment, such items, according to what I am satisfied is proper practice, should be comprehended in the general charge of attorneys' fees and are not proper items of a separate charge; as well might be included a separate charge for office rental.

■ Counsel for several individual bondholders appeared at the various hearings upon the initiative of such individual bondholders. Believing that the bondholders as a body were properly and sufficiently represented, and such individual bondholders not adding anything of value to the corpus of the trust, I do not feel justified in allowing compensation for such service.

■ The brokerage houses mentioned procured the sale of the first mortgage bonds in the beginning. It was to their interest, therefore, to watch the procedure by which their clientele were compensated on the investment. Owing to the nature of the

securities here involved, as a necessary incident of their wide distribution, it is impossible for the bondholders themselves to take concerted action for the protection of their rights. This can be initiated only by the agency having access to the records of their identity and residence. It is to the credit of the brokerage houses that here such action was taken, and experienced men were furnished to act for the bondholders. Nevertheless, something in the nature of a public duty impels such service upon the part of brokerage houses, especially where, as here, they themselves have marketed the securities in the first place. A reasonable compensation to the members of the bondholders' committee under the circumstances shown at this hearing is $10,000, to be divided among them as they may themselves agree.

■ The trustee of the corporation under the reorganization proceedings, C. J. Pearce, appointed temporary trustee in the beginning, covering a period of over two years, has had the entire charge of the properties involved. With his counsel, Mr. Earle M. Daniels, he was depended upon by the court to check the proceedings at all stages, and his position has been one of much labor and difficulty. His management of the property itself has been economical and highly efficient, the rental returns having been fully maintained. Such duties have not been delegated to subordinates but have been attended to personally, and the extra compensation, amounting to $6,-000, covering the entire period asked by the trustee, is entirely reasonable. The same character of service has been rendered by counsel for the trustee, Mr. Earle M. Daniels.

■ In connection with the petition of Bank of America National Trust & Savings Association for an allowance of fees and expenses as trustee under the deed of trust dated as of April 1, 1937, executed by Broadway Spring Arcade Building Corporation, the reorganized corporation, and as depositary for general mortgage bonds of the debtor, and as transfer agent and agent and depositary for the voting trustees for Broadway Spring Arcade Building Corporation, the court is of the view that the fees requested are excessive when consideration is given to the financial condition of the debtor. Therefore, without attempting to determine and fix specific amounts for each item of service to be rendered, the court cannot approve as reasonable any fees in excess of the following: For all services to be rendered as set forth in the petition, excluding therefrom recurring items such as annual fees after the first annual fee under the trust indenture, and other recurring fees of a similar character, the sum of $6,000; and for all services of a recurring nature subsequent to the first annual period the sum of $1,650 per annum. In addition to these sums, the bank should be allowed reimbursement for its necessary expenses. Accordingly, the fees requested are hereby disallowed and the fees of said Bank of America are hereby fixed in the amounts hereinbefore set forth.

■ Having noted such matters as seem to call for comment, I have made an analysis of the various claims for compensation and expenses that have been presented and fixed the following schedule, which shows the amount allowed and the amount rejected:

## SCHEDULE

| Name of Claimant and Amount of Claim | Fees Allowed | Fees Rejected | Expenses Allowed | Expenses Rejected |
|---|---|---|---|---|
| John J. Kuhn, | | | | |
| Balance due on atty's fees.... | $ 3,750.00 | $ 3,750.00 | | |
| Expenses ................. | 358.91 | | $ 358.91 | |
| White & Clapp, | | | | |
| Attorney's fees............. | $ 1,000.00 | | $ 1,000.00 | |
| Expenses ................ | 3.80 | | | $ 3.80 |
| (All incurred in 1931–1932) | | | | |

| Name of Claimant and Amount of Claim | Fees Allowed | Fees Rejected | Expenses Allowed | Expenses Rejected |
|---|---|---|---|---|
| **Gibson, Dunn & Crutcher,** | | | | |
| Attorney's fees............. $15,000.00 | $12,500.00 | $ 2,500.00 | | |
| Expenses: | | | | |
| Long distance telephone.... 296.65 | | | | $ 296.65 |
| Telegrams ............... 128.31 | | | $ 128.31 | |
| Notary and filing fees...... 12.95 | | | 12.95 | |
| | | | | |
| **Federal United Corporation and Chartered Investment Company,** | | | | |
| Attorney's fees............. $ 1,075.00 | | | | $1,075.00 |
| Traveling, telegraphic and telephone expense.......... 115.08 | | | | 115.08 |
| | | | | |
| **Riegelman, Hess & Hirsch,** | | | | |
| Attorney's fees............. $15,000.00 | $ 2,500.00 | $12,500.00 | | |
| Expenses: | | | | |
| Telephone ............... 31.85 | | | | $ 31.85 |
| Telegrams ............... 26.53 | | | | 26.53 |
| Taxi and carfare.......... 4.94 | | | | 4.94 |
| Filing fees................ 154.49 | | | | 154.49 |
| Legal fees................ 25.00 | | | | 25.00 |
| Miscellaneous ............ 105.15 | | | | 105.15 |
| | | | | |
| **Earle M. Daniels,** | | | | |
| Attorney's fees............. $25,000.00 | $17,500.00 | $ 7,500.00 | | |
| | | | | |
| **C. J. Pearce,** | | | | |
| Additional trustee's fees..... $ 6,000.00 | $ 6,000.00 | | | |
| | | | | |
| **Mitchell, Silberberg, Roth & Knupp,** | | | | |
| Attorney's fees............. $ 3,000.00 | $ 3,000.00 | | | |
| | | | | |
| **Harry G. Sadigoff,** | | | | |
| Attorney's fees............. $ 4,000.00 | | $ 4,000.00 | | |
| | | | | |
| **Frank A. Wilcox and George A. Judson,** | | | | |
| Attorney's fees............. $ 750.00 | | $ 750.00 | | |
| | | | | |
| **Julius V. Patrosso,** | | | | |
| Attorney's fees............. $ 2,500.00 | $ 2,500.00 | | | |
| | | | | |
| **Townsend, Elliott & Munson,** | | | | |
| Attorney's fees............. $15,000.00 | $ 2,500.00 | $12,500.00 | | |

| Name of Claimant and Amount of Claim | Fees Allowed | Fees Rejected | Expenses Allowed | Expenses Rejected |
|---|---|---|---|---|
| **Beekman, Bogue, Leake, Stephens & Black,** | | | | |
| Attorney's fees.............. $30,000.00 | $15,000.00 | $15,000.00 | | |
| L. B. Soper, | | | | |
| Traveling expenses........ 2,119.51 | | | | $2,119.51 |
| Tel. & Tel. from L. A...... 147.50 | | | | 147.50 |
| Petty cash vouchers........ 1,400.34 | | | | 1,400.34 |
| Carfares ................. 8.05 | | | | 8.05 |
| Postage ................... 47.38 | | | | 47.38 |
| Telephones ............... 1,186.85 | | | | 1,186.85 |
| Typewriting .............. 1,079.61 | | | | 1,079.61 |
| Miscellaneous ............ 12.38 | | | | 12.38 |
| | | | | |
| **City Bank & Farmers Trust Co.** Trustee and Registrar Under Old Bonds: | | | | |
| Fees as trustee.............. $ 1,150.00 | $ 900.00 | $ 250.00 | | |
| Telegrams, etc............... 9.97 | | | | $ 9.97 |
| Attorney's fees.............. 350.00 | | | | 350.00 |
| | | | | |
| **Bank of America National Trust & Savings Association, Trustee Under Old Bond Issue,** | | | | |
| Attorney's fees.............. $ 650.00 | | | | $ 650.00 |
| Trustee's fees............... 850.00 | $ 700.00 | $ 150.00 | | |
| Disbursements ............. 12.45 | | | | 12.45 |
| | | | | |
| **Louis A. Mahoney, Bondholders Protective Committee,** | | | | |
| Fees for Committee: | | | | |
| Louis A. Mahoney......... $10,000.00 | | | | |
| Wm. Buschbaum.......... 5,000.00 | | | | |
| Wm. B. Klee............. 5,000.00 | $10,000.00 | $15,000.00 | | |
| Homer Reid, Jr........... 5,000.00 | | | | |
| Attorney's fees............. 1,305.67 | | | | $1,305.67 |
| Printing, etc............... 1,474.66 | | | $1,474.66 | |
| Administrative expenses..... 9,366.80 | | | 9,366.80 | |
| Tel. & Tel................. 302.39 | | | 302.39 | |
| Traveling ................. 393.35 | | | 393.35 | |
| Court Reporter............. 95.00 | | | 95.00 | |
| Filing Fee................. 75.71 | | | 75.71 | |
| Postage & Insurance........ 613.59 | | | 613.59 | |
| Interest on Loan........... 812.89 | | | 812.89 | |
| Fees, Appraisal, etc......... 1,200.00 | | | 1,200.00 | |
| Auditing Expense........... 2,296.93 | | | | $2,296.93 |
| Depositary fees: | | | | |
| Guaranty Trust Co......... 5,250.00 | | | 2,500.00 | 2,750.00 |
| Plan of Reorganization.... 3,150.00 | | | | 3,150.00 |
| Davis, Rlk, etc............ 250.00 | | | | 250.00 |
| Expenses ................. 265.94 | | | 265.94 | |
| Miscellaneous ............ 85.90 | | | 85.90 | |
| Amount asked to wind up business $1,500.00 | $1,500.00 | | | |